Matter of Leonard St. Props. Group, Ltd. v New York State Div. of Hous. & Community Renewal (2019 NY Slip Op 08165)





Matter of Leonard St. Props. Group, Ltd. v New York State Div. of Hous. & Community Renewal


2019 NY Slip Op 08165


Decided on November 12, 2019


Appellate Division, First Department


Tom, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on November 12, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rosalyn H. Richter, J.P.
Peter Tom
Ellen Gesmer
Cynthia S. Kern
Peter H. Moulton, JJ.


100887/17 9787 

[*1]In re Leonard Street Properties Group, Ltd., Petitioner-Respondent,
v
The New York State Division of Housing and Community Renewal, Respondent, Jamie Lawenda, Intervenor-Respondent-Appellant.



Respondent Jamie Lawenda appeals from the order and judgment of the Supreme Court, New York County (Arlene P. Bluth, J.), entered May 7, 2018, to the extent appealed from as limited by the briefs, granting the article 78 petition to the extent of permitting petitioner landlord to eliminate elevator service in the building.




Ween & Kozek, PLLC, Brooklyn (Andrew D. Cassady and Michael P. Kozek of counsel), for appellant.
Kucker & Bruh, LLP, New York (Robert H. Berman of counsel), for respondent.



TOM, J.


On this appeal from an order permitting petitioner landlord to eliminate elevator service in a residential building, we reverse based on statutory and regulatory constraints which leave no room for equitable treatment outside of the requirements of the Rent Stabilization Code, with some necessary reference under the facts of this case to provisions of the Loft Law that were previously applicable to the subject building. Notwithstanding the expense that the petitioner will bear, we cannot hold that respondent New York State Division of Housing and Commmunity Renewal's (DHCR) ultimate determination was legally irrational in the [*2]interpretation and application of its own regulations, which is the standard by which we are governed in undertaking a CPLR article 78 review.
DHCR has not appeared on this appeal. Respondent-intervenor is a tenant, Jamie Lawenda, who has occupied an apartment under a lease in the building owned by petitioner since 1979. The eight-unit premises, identified by the Department of Buildings as a C-7 walk-up apartment building, had a single elevator which was regularly used by Lawenda, although the regularity of its use by other tenants, who are not parties to this proceeding, is disputed and cannot be conclusively resolved on this record. The building eventually fell under the regulatory auspices of Article 7-C of the Multiple Dwelling Law, more commonly termed the Loft Law, until July 31, 2009. After that date, four of the units, including apartment 3S, were rent-stabilized and thereby fell under the jurisdiction of respondent DHCR. The present dispute arises over petitioner landlord's obligations with respect to the repair or the replacement of the elevator.
A rider to the lease assigned to Lawenda in 1979, when residency was not a lawful use, stated that the landlord "will not furnish a manned elevator service at any time during the term of this lease," and that should the landlord exercise the right to eliminate elevator service, any elevator service previously provided by the landlord "shall not, however, be considered a waiver by the landlord of the right to remove such service at any time and without any notice." The rider further provides that if the elevator "for whatever reason becomes inoperative, it shall not be the responsibility of the landlord to repair" it, although the tenants may do so at their own expense upon the landlord's written approval. The landlord relies on this lease provision as one reason to disclaim its legal responsibility to provide elevator service, a position that is untenable as will be noted below.
However, the nature of the elevator service is central to this case, warranting our review even if, upon review, we reject the petitioner's position. Supreme Court characterized this case as not involving "normal" elevator service as measured by current residential standards. Lawenda presently argues, however, that such a characterization is irrelevant to regulatory requirements central to this case mandating that elevator service, which had been provided during the critical period relevant herein, be continued and maintained.
The record indicates that the sole elevator servicing this eight-unit building was close to a century old, reflected the design and operation of that much earlier period and the former legal use of the building and potentially presented a safety hazard as will be noted below. The elevator became inoperable in 2009, although whether it broke down — the petitioner landlord's claim — or the landlord simply terminated its operation without prior regulatory approval and eventually dismantled it — Lawenda's contention — remains in dispute. The parties dispute the distinction between mere inoperability, with the related consideration whether the elevator could have been repaired versus the dismantling of the elevator and, upon subsequent removal, whether a code compliant new elevator had to be installed to comply with regulatory mandates. These issues were central to the analysis applied during the administrative and civil proceedings below.
The sequence of the relevant applications and the proceedings is important. Different regulatory regimes and their respective enforcement agencies also must be kept in mind. The building was an interim multiple dwelling initially falling under the auspices of the Loft Law codified in the Multiple Dwelling Law, which then became rent-stabilized and thereby came under the jurisdiction of DHCR. As noted above, we can use July 31, 2009 as the date when the building effectively fell within DHCR's jurisdiction.
Before the regulatory transition, the landlord applied to the Loft Board in early 2009 to establish a base rent that would then be incorporated into the legal rent for four residential tenants for rent stabilization purposes. By Loft Board order dated June 18, 2009, the monthly base rent for Lawenda's residence was set at $745.06, which she unsuccessfully challenged. Both parties subsequently sought administrative relief before DHCR, the Department of [*3]Buildings, and in court. Two different DHCR determinations in 2010 and 2017, which reached different conclusions, as well as two article 78 orders and a violation issued by the New York City Department of Buildings ensued.
During the period of transition from the building's interim multiple dwelling status to rent-stabilized status, the issue of the elevator's operability arose. On or about August 20, 2009, the landlord applied to DHCR for permission to reduce services with respect to the elevator which, it claimed, could no longer be maintained in a cost-effective manner. The landlord stated that the manually operated freight elevator, which served only a single tenant on a lower floor, was at least 75 years old and constantly broke down, and spare parts were no longer being manufactured. The landlord emphasized that the Department of Buildings classified the building as a C-7 walk-up apartment building. The landlord relied on an attached inspection report by an elevator engineer recommending that the only viable options were to remove and/or replace the elevator, the cost of which was estimated to be $150,000.
The landlord contended that this could not be justified by the elevator's limited use. Recoupment by a Major Capital Improvement (MCI) rent increase would be capped at 6% and would be charged only to the two south side tenants who could access the elevator. Since most of the rent-regulated tenants did not utilize the elevator, the landlord characterized its removal as only a minor reduction in service. However, this application did not explicitly state that the elevator presently was inoperable, an omission that became relevant for the 2017 DHCR determination adverse to the landlord and relied on by Lawenda for the present appeal.
The elevator inspection report dated August 10, 2009 described the manual operation of the elevator as requiring an operator to maintain a hand on either an up or down button to bring the elevator to the floor level desired, where the elevator sill had to be lined up with the hallway sill, with the door remaining locked until that was accomplished from the inside. This presented a safety hazard since in the event of a fire, the passenger could not exit the locked elevator. The inspector also noted that the elevator door was a scissor gate through which a child's arm or foot, or a passenger's clothing, could pass, potentially causing serious injuries. Hence, the inspector noted that the existing elevator was a safety hazard. In view of these hazards to life and safety, and especially since the building was classified as a walk up, the inspector recommended leaving the elevator out of service, and that it be removed or replaced. However, the inspector's report did not address the feasibility or likelihood of repairing the elevator, nor even explicitly state that it was broken.
A DHCR decision was not immediately forthcoming. The New York City Department of Buildings' Environmental Control Board (ECB), meanwhile, issued a notice of violation against petitioner dated September 25, 2009 in connection with a termination of elevator service. Although DHCR was now the state agency for rent regulation purposes, the Department of Buildings was authorized to enforce housing standards in New York City. The ECB concluded that petitioner failed to maintain the building in a manner compliant with applicable New York City regulations in that the single elevator was out of service, creating a condition hazardous to human health, in violation of 1 RCNY 11-02 (a)(1). Hence, the conclusion to be drawn is that the landlord had already removed the elevator from operation, although the manner of the removal - either a mere cessation of operations or a mechanical removal of functional equipment - was not specified.
The ECB scheduled a hearing for October 15, 2009. By order dated October 21, 2009, the ECB directed that until DHCR granted the landlord permission to remove the elevator it must be maintained to avoid injury to tenants and visitors. As Lawenda argues and DHCR in its 2017 determination, infra, found, the landlord had not yet established that the elevator was broken, inoperable and not repairable.
By application dated October 23, 2013, the landlord then applied to the Department of [*4]Buildings to amend its elevator permit to permit it to dismantle the elevator. The application seemingly was approved on November 20, 2013. A Mechanical Data Query dated March 25, 2014 reflected that the "freight elevator" had been approved for dismantling on March 6, 2014. This, of course, created some confusion in the administrative record since this order was inconsistent with ECB's directive.
Meanwhile, Lawenda and another rent-stabilized tenant commenced a proceeding in Civil Court's Housing Part by order to show cause dated November 6, 2009 to require the restoration of elevator service. The Housing Part stayed that proceeding pending the outcome of the DHCR application. As noted above, the other tenant is not a party to the present proceeding.
By a supplemental submission to DHCR dated February 16, 2010, the landlord, responding to the tenants' December 9, 2009 opposition to the application, now claimed that the application "is clearly premised upon the sudden breakdown of the elevator device in August 2009," that it was "immediately filed with DHCR upon the occurrence of the breakdown and the owner's receipt of an estimate from its elevator contractor that repair of the elevator was not feasible," and that "an expensive overhaul that will cost $150,000 is the only alternative, short of discontinuing the service." These precise statements, however, are not reflected in the earlier submissions summarized above and seemed more in the nature of a tactical afterthought.
The landlord now claimed that this evidence remained unrebutted by the tenants, nor was it rebutted that the elevator only directly affected two rent-stabilized tenants. The landlord noted that the two rent-stabilized tenants on the north side of the building had not even responded to the application, compelling the conclusion that the elevator serviced, at most, the two south side rent-stabilized tenants. Moreover, the landlord argued, the tenants had not rebutted the description of the manually operated elevator as outdated and unsafe, or that Lawenda basically monopolized it by keeping it parked on her floor. The landlord therein also disputed whether any residue of regulation under the Loft Law, specifically pertaining to maintaining the elevator as a required service, had regulatory relevance.
By administrative order dated April 13, 2010, DHCR's rent administrator granted the landlord's application to eliminate elevator service, but ordered a reduction of five percent in the rent for the four rent-stabilized apartments with no distinction made for whether all of those tenants actually used the elevator. The rent administrator, categorizing the application as one to decrease tenant services, noted that such an application ordinarily would not be granted. However, the rent administrator noted the age of the elevator and that it had thus "outlived its useful life." As will be noted below, DHCR in its 2017 order in rejecting the 2010 analysis found that these were not relevant standards applicable to a discontinuation of required services. The rent administrator seemed to accept that replacement would cost approximately $150,000 without making further findings as to the costs or the feasibility of repairs, omissions that also became relevant for purposes of the later 2017 DHCR order. The rent administrator also noted that the nature of its manual operation made it, in effect, unavailable for use by tenants "as normal elevator service would be." The rent administrator further found that the tenants even conceded that given the configuration of the building those on the north side could not use it unless they were granted access through the south side lofts. Hence, the rent administrator found that the elimination of the "tenant operated, manually operated" elevator was not inconsistent with the Rent Stabilization Code and should be granted. Finding that the discontinuation of the service was neither significant nor de minimis, the rent administrator found that a rent reduction of 5% was appropriate. If the owner decided to replace the elevator, a further rent adjustment could be made at that time.
By administrative order dated August 29, 2013, DHCR, finding the evidence to be unrebutted that the elevator had not been working and there was little likelihood that it could be in working order, denied both parties' petitions for administrative review (PAR).
Lawenda thereafter commenced the first article 78 proceeding challenging the DHCR determination. DHCR, rather than adhering to its original determination, cross-moved to have the matter remitted for further factual review upon allowing the parties to enlarge the record to address the feasibility of restoring elevator service and the attendant costs.
By order dated December 5, 2014, New York County Supreme Court (Margaret A. Chan, J.), concluded that the rent administrator for DHCR had not sufficiently addressed the possibility and cost of rehabilitating the elevator as contrasted with its outright removal. The court also noted that DHCR, in its submissions, evinced an intention of revisiting Lawenda's claim that the elevator could have been repaired without great expense, which the agency had not initially fully addressed. Hence, Supreme Court concluded that remand to DHCR was necessary because further factual review could lead to a different outcome. The court, however, rejected Lawenda's challenge to DHCR's jurisdiction since at the time of the landlord's application to eliminate the elevator service, the Loft Board's jurisdiction over the terms and conditions of the tenancy had terminated. This order was not appealed, placing beyond present review any issue that DHCR lacked jurisdiction.
Upon remand, the landlord submitted a 13-page proposal from an elevator repair company dated September 22, 2009 detailing the components necessary for the installation of a new "modern generic type solid state" automatically operated elevator, for an estimated cost of $349,000. The landlord also submitted a new letter opinion dated April 30, 2015 from the previously retained elevator inspector explaining why the existing elevator was unserviceable owing to its age, the resulting wear and tear and the unavailability of both the parts and expertise necessary to return the device and its components to safe service. The letter referenced a provision of the current National Elevator Code ostensibly requiring that it be dismantled and/or removed from service. The letter further explained that the existing hoistway, overhead space, and the dimensions of the machine room and pit did not meet current code requirements, so that a replacement was not feasible without major reconstruction of that area of the premises. On this basis, the engineer estimated the total costs of a replacement as ranging from $260,000 to $300,000 after estimated initial pre-installation construction costs of $150,000. Hence, the point made by the landlord and its specialists was that the elevator service as it had existed could not be maintained, but only replaced by a new service with attendant, and unreasonable, costs.
By order dated May 3, 2017, DHCR, on remand, granted the tenant's PAR and reversed its prior order granting the landlord's request for termination of elevator service. DHCR ordered the landlord to restore elevator service as a required ancillary service for the building. DHCR cited to 29 RCNY section 2-04(b)(9) as requiring the landlord, for interim multiple dwellings under the Loft Law, to provide freight or passenger elevators in good working order. DHCR then referenced section 2520.6(r)(1) of the Rent Stabilization Code, defining required services as those that the landlord maintained or was required to maintain on the base date when the building transitioned to rent-stabilized status, and subsection (r)(3) defining ancillary services as those not within the individual housing unit but which nevertheless were provided on the base date, or should have been or thereafter were legally required. Although the objection was made that the broken elevator thereby was not in service on the base date, the record is not clear on that point as is noted elsewhere, but it also is irrelevant if elevator service had been mandated by the Loft Law, a mandate that carried over under rent stabilization, which is addressed below.
DHCR took the position that no reduction in services is permissible prior to DHCR's approval of the application. DHCR found that the Code prohibits a landlord's "unilateral" action of decreasing or eliminating a service prior to DHCR approval since there is no textual provision for a retroactive approval, which provided an additional basis for what DHCR now concluded was an erroneous earlier determination. Additionally, DHCR found no textual relevance in either the Rent Stabilization Law or Code to whether the elevator had exceeded its "useful life," a term [*5]pertinent only to MCI approvals and correlating rent increases but not applicable to a reduction of service.
DHCR now found that the rent administrator and initial DHCR denial of the PAR had failed to link its reasoning with particular rent stabilization regulations. To the contrary, DHCR, addressing the landlord's economic objections to restoring elevator service, noted that it "has not developed standards to measure the cost of repair or replacement of elevators as a separate equitable basis to discontinue a required service." Rather, DHCR pointed out that the Major Capital Improvement program is designed to facilitate repairs and the upgrading of outdated equipment by establishing formulas for correlating rent increases. Nor, DHCR found, did the landlord demonstrate a financial hardship that would have made repairs impossible at the time the landlord's application was filed in 2009.
The landlord appealed this second DHCR determination in a second article 78 proceeding. Supreme Court (Arlene P. Bluth, J.), reinstating the earlier 2010 DHCR determination, granted the landlord's petition to the extent of allowing it to eliminate elevator service at the building but denied it to the extent of remanding the rent reduction to DHCR. In a strongly phrased decision, the court found the 2017 DHCR determination to be irrational. Supreme Court focused on various facts placing in doubt the continuing utility of the now-discontinued elevator: the north side tenants had no ready access to the elevator unless they were allowed to cross through the south side units, access that was contingent on the availability as well as the willingness of the south side tenants; only two rent-stabilized tenants were on the south side of the building and of those only one, Lawenda, who resided on the third floor (the second tenant was on the second floor), regularly used the elevator; the building was classified by the Department of Buildings as a walk-up, and in view of its manual operation in which the elevator could not be sent to or summoned from a floor, it effectively operated as a walk-up, basically undermining the need for elevator service. The court found that DHCR, which "treated the elevator as if it were a normal elevator," had "utterly failed to consider how the elevator is actually used by the tenants."
The court also found that the 100 year-old elevator was no longer operable because of its age, justifying the original 2010 decision of the rent administrator to allow discontinuation of service. The court rejected Lawenda's contention as unsupported speculation that the repair costs would have been minimal. Although Lawenda contended that the elevator was dismantled in 2014, the court acknowledged the landlord's argument that, in contrast to the 2017 DHCR findings, it did not unilaterally terminate service. Rather, the court found, the elevator stopped working, it was not repairable, and the expense of installing a new one was unreasonable. The court construed the recommendation by the elevator inspector, suggesting that even returning the elevator as it had existed to operability would have presented a safety risk, to be essentially unrebutted, further supporting DHCR's 2010 determination. Hence, on the facts, the court found the 2017 DHCR determination to be unreasonable.
On the law, the court found that the 2017 determination failed to establish why the prior determination was inconsistent with the Rent Stabilization Law and Code. To the contrary, the court found, the rent administrator upheld the purposes of the law in 2010 by reaching a result that attended to tenant safety and resolved the unreasonable cost factor by decommissioning the elevator and reducing rents. The court also rejected as irrational and unsupported the 2017 DHCR conclusion that the landlord had violated the Rent Stabilization Code by unilaterally taking the elevator out of commission. The court rejected as irrational DHCR's 2017 conclusion that the Loft Law governed the issue insofar as the landlord's October 9, 2009 application for a reduction in services was filed after the Loft Board's jurisdiction ended 35 days after mailing the June 18, 2009 determination of the base rent. The court noted that DHCR had not explicitly found as a predicate for Loft Law jurisdiction that the building was an interim multiple dwelling, [*6]so that DHCR's reliance on 29 RCNY 2-04(b)(9) was unavailing. The practical effect of DHCR's 2017 determination, which, the court found, "simply ignored the crucial facts and ordered [the landlord] to restore elevator service," forced the landlord under these circumstances to install a new elevator since, even if it had not been dismantled, restoring it to service would have presented safety hazards. Hence, the court held, DHCR's focus on the "theoretical cost ... to fix a century-old elevator" was itself an immaterial endeavor. Without itself endeavoring to evaluate whether the landlord had the resources to install a new elevator, the court found the order directing the landlord to install an expensive new elevator for a single rent-stabilized tenant in a walk-up building to be irrational under these circumstances, especially when MCI increases to mitigate the costs would be capped at six percent for tenants whose average 2009 monthly rent at the time of the order was $976.37.
Although Supreme Court may have sought to be practical, in an article 78 proceeding a court is governed by whether the administrative agency, interpreting its enabling legislation and applying its own regulations, acted irrationally (Matter of Tockwotten Assoc. v New York State Div. of Hous. & Community Renewal, 7 AD3d 453 [1st Dept 2004]). As we have held, "[O]nce it has been determined that an agency's conclusion has a sound basis in reason ... the judicial function is at an end" (Matter of Partnership 92 LP & Bdlg. Mgt. Co., Inc. v State of NY Div. of Hous. & Community Renewal, 46 AD3d 425, 428 [1st Dept 2007], affd 11 NY3d 859 [2008] [internal quotation marks and citation omitted]). Even if the court reasonably could have reached a different result, the administrative determination, if rational, must be upheld (Matter of West Vil. Assoc. v Divsion of Housing & Community Renewal, 277 AD2d 111, 112 [1st Dept 2000]).
Since DHCR was interpreting its own regulations, it was entitled to deference (Matter of IG Second Generation Partners L.P. v New York State Div. of Hous. & Community Renewal, Off. of Rent Admin., 10 NY3d 474, 481 [2008]; Matter of 900 W. End Ave. Tenants Ass. v New York State Div. of Hous. & Community Renewal, 53 AD3d 436, 438 [1st Dept 2008]) even if the benefit to a single tenant imposed substantial difficulties on the landlord (Matter of Lite View LLC v New York State Div. of Hous. & Community Renewal, 97 AD3d 105 [1st Dept 2012]) or when an adequate substitute for the diminished service was not provided (Matter of Joralemon Realty NY, LLC v State of N.Y. Div. of Hous. & Community Renewal, 102 AD3d 965 [2d Dept 2013]). Nor would we reject DHCR's findings on the basis espoused by Supreme Court, that the elimination of the sole elevator service is a de minimis reduction of services, regardless of whether a single tenant, or two or more would be adversely affected thereby since this, too, would be a matter within DHCR's purview. When a landlord applies to DHCR to reduce required services, DHCR "has broad discretion in evaluating pertinent factual data and inferences to be drawn therefrom" (Matter of 333 E. 49th Assoc., L.P. v New York State Div. of Hous. & Community Renewal, Off. of Rent Admin., 40 AD3d 516 [1st Dept 2007], affd 9 NY3d 982 [2007]).
The procedural route this case has taken manifestly was not straightforward. However, when the appeal is shorn of some of the administrative diversions, the statutory and regulatory directives which DHCR applied are fairly direct. Initially, we can quickly dispatch any contention that the disclaimer of responsibility for elevator services set forth in the lease displaces regulatory requirements. To the contrary, the private agreements documented in the lease dating back at least to 1979, when the building ostensibly operated under a different legal use, necessarily must yield to housing and rent regulations. Subsequently, the building and this tenancy were governed by the New York City Loft Law until the unit became rent-stabilized on or about July 31, 2009. The Loft Law was a legislative device to transition former manufacturing and commercial buildings to residential use which previously had been unlawfully occurring, which, for interim multiple dwellings, superseded prior inconsistent lease provisions.
The Loft Law was "designed to integrate ... uncertain and unregulated residential units, [*7]converted from commercial use, into the rent stabilization system" and "to provide for the transition of unregulated loft dwelling units into the rent stabilization system and to harmonize with, rather than supplant, existing forms of regulation" (Blackgold Realty Corp. v Milne, 119 AD2d 512, 515, 513 [1st Dept 1986], affd 69 NY2d 719 [1987]). During the time when respondent's apartment was classified as an interim multiple dwelling it was subject to the minimum housing standards set forth in 29 RCNY 2-04(b). The New York City Loft Law therein directs that the landlord "must provide ... to residential occupants qualified for the protection of Article 7-C of" the Multiple Dwelling Law specified building services which are mandatory requirements that apply regardless of the absence of specific lease provisions or notwithstanding lease provisions to the contrary. Section 2-04(b)(9) of the Loft Board's regulations directs that the landlord "must not diminish nor permit the diminution of legal freight or passenger elevator service and must maintain this service in good working order." The landlord may also provide services pursuant to the lease that are in addition to the mandated services, but these, too, may not thereafter be diminished.
If the prior services, such as elevator services in this case, fall below those mandated by section 2-04(b), then these mandated services must be provided (29 RCNY section 2-04[c]). The Loft Board is empowered "to take all steps necessary to enforce the minimum housing maintenance standards" (id., section 2-04[e][1]). The Loft Board has interpreted section 2-04 to prohibit the diminution of services that had been provided even if they were not required by the lease (Matter of 29 John St. Tenants' Assoc., OATH Index No. 1982/96 [Nov. 20, 1996], affd in part and revd in part on other grounds, Loft Bd. Order No. 2058 [Jan. 30, 1997]).
When the building transitioned to rent stabilization, the requirements of the Loft Law did not become obsolete but were carried over to the succeeding regulatory regime. Under the Rent Stabilization Code, "required services" are defined as those, including elevator services, that the owner "was maintaining or was required to maintain ... and any additional services provided or required to be provided thereafter by applicable law" (9 NYCRR 2520.6[r][1]), dating to when the Loft Board established the initial rent (id., 2520.6[r][4][ix]). As previously noted, the record does not support a conclusion that the landlord had not provided elevator service while the building was governed by the Loft Law, whether dated to the determination of base rent or the date when the building passed from Loft Law regulation to rent stabilization, or even that elevator service as such was nonexistent by virtue of the elevator being permanently inoperable, a circumstance that would be irrelevant in any event. Moreover, as DHCR noted, 9 NYCRR 2522.4(e) only authorizes a reduction in required services on one of three grounds: if the landlord and tenant both agree; if the reduction is necessary for the operation of the building in order to comply with the law; or if the reduction in required services is not inconsistent with the Rent Stabilization Law or Code. DHCR found that none of these grounds applied.
DHCR in its 2017 determination interpreted its own regulations to require that if elevator service was required under the Loft Law, it was also required under the Rent Stabilization Code upon the transition of the building to rent stabilization. This interpretation by DHCR of its own regulations should be upheld to the extent it is rational and not an arbitrary and capricious reliance on the facts of the case (Matter of Lite View, LLC v New York State Div. of Hous. & Community Renewal, 97 AD3d 105, 108-110 [1st Dept 2012]). Certain facts are unclear regarding if and when the elevator broke down, or when the landlord acted on a decision to terminate operations. However, in view of the above, that would seem not to matter under these circumstances. Since elevator service had been provided while the building was regulated as an interim multiple dwelling, that service had to be continued without regard to the economic ramifications. In this sense, the cost to the landlord is not a factor that would displace the regulatory requirements and would not support setting aside the DHCR determination.
The landlord relies on DHCR's initial grant of its application to discontinue elevator [*8]service for the reasons outlined above. However, there are some flaws in the rent administrator's findings and analysis which the 2017 DHCR decision noted. DHCR, strictly adhering to the regulatory terminology, now takes the position that a landlord cannot retroactively seek approval for the elimination of a required service that was already terminated, and that the landlord especially cannot discontinue the service unilaterally. Whether by simply ending the elevator's operations or by proceeding to a complete dismantling of the elevator, the elimination of the service preceded the initial 2010 approval by the rent administrator. In either sense, the landlord's action was unilateral. We find no basis grounded in statutory or regulatory text to controvert DHCR's construction of its own regulations. Nor, even if we might consider an argument that the elevator's breakdown and the impossibility of repair was not an action, let alone a unilateral action, by the landlord, do we find support for such a claim here. As noted above, the landlord's initial application to DHCR did not indicate a breakdown, and if it did, the feasibility and cost of repairs was not identified at that time, placing in doubt the reliability of such an argument. The landlord's later submissions in response to the tenant's opposition, that the breakdown, inoperability and unavailabiliity of repair were unrebutted, did not persuasively cure the initial omission in the application.
In the final analysis, we cannot conclude that DHCR was arbitrary and capricious in its evaluation of the relevant facts or irrational in concluding that in whatever manner elevator service was terminated, that action in the absence of DHCR's approval was inconsistent with rent stabilization, and that elevator service, as a required service, had to be restored.
Accordingly, the order and judgment of the Supreme Court, New York County (Arlene P. Bluth, J.), entered May 7, 2018, to the extent appealed from as limited by the briefs, granting the article 78 petition to the extent of permitting petitioner landlord to eliminate elevator service in the building, should be reversed, on the law, without costs, the petition denied, and the proceeding dismissed.
All concur.
Order and judgment, Supreme Court, New York County (Arlene P. Bluth, J.), entered May 7, 2018, unanimously reversed, on the law, without costs, the petition denied, and the proceeding dismissed.
Opinion by Tom, J. All concur.
Richter, J.P., Tom, Gesmer, Kern, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: NOVEMBER 12, 2019
CLERK